# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST 1999 SESSION

**FILED**

**January 18, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | No.M1998-00600-CCA-R3-CD |
| | ) | **C.C.A. No. 01C01-9809-CR-00377** |
| Plaintiff/Appellee, | ) | |
| | ) | **Wilson County** |
| v. | ) | |
| | ) | **Honorable James O. Bond, Judge** |
| **DAVID P. NEAL,** | ) | |
| | ) | **(Voluntary Manslaughter)** |
| Defendant/Appellant. | ) | |

**FOR THE APPELLANT:**

**V. MICHAEL FOX**
Bruce, Weathers, Corley, Dughman
 & Lyle
315 Deaderick Street
First American Center, 20th Floor
Nashville, Tennessee 37238-2075

**FOR THE APPELLEE:**

**PAUL G. SUMMERS**
Attorney General & Reporter

**GENERAL DOUG HALL**
Assistant District Attorney

**GEORGIA BLYTHE FELNER**
Counsel for the State
Criminal Justice Division
425 Fifth Avenue North
Nashville, Tennessee 37243-0493

**AFFIRMED**

**L. T. LAFFERTY, SENIOR JUDGE**

## OPINION

The appellant, David Neal, referred hereinafter as the "defendant," appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. As a result of a Wilson County jury finding the defendant guilty of voluntary manslaughter, the trial court

imposed a sentence of four and one-half (4½) years in the Department of Correction, denying the defendant's application for full probation.

The defendant presents three issues for appellate review:

1.    Whether the trial court erred in applying enhancement factor (1), Tenn. Code Ann. § 40-35-114, to enhance the defendant's sentence for his two arrests of driving under the influence of intoxicant subsequent to his conviction for voluntary manslaughter?

2.    Whether the trial court erred in applying enhancement factor (6), Tenn. Code Ann. § 40-35-114, to enhance the defendant's sentence based upon the amount of damage to the personal property belonging to the victim being particularly great?

3.    Whether the trial court erred in denying probation to the defendant?

After a review of the entire record, the briefs of the parties, and applicable law, we AFFIRM the trial court's judgment.

## FACTUAL BACKGROUND

The defendant was indicted by the Wilson County Grand Jury for the offense of murder second degree, involving the death of his roommate, Wally F. Haynes, on November 3, 1996. On November 12, 1997, a jury found the defendant guilty of voluntary manslaughter. The record does not contain a transcript of the actual facts surrounding the death of Wally Haynes. The sentencing hearing occurred on January 21, 1998. The pre-sentence report filed in this record, sets out the defendant's version of the offense, from which we quote in pertinent parts:

> Me and Wally had gone out to the Chute and Wynona's bar. We had a mostly normal night. On the way home he was angry about something. I never really knew why he was angry to start out with. Then I told him that he was either going to love life or love cocaine and he slammed on the brakes and slammed the car into park and got out. Then I drove home. On the rest of the way home he was pulling on his hair and making animal noises, ripped the rearview mirror off the windshield. I tried to remain calm and finally got home. When we got home, Wally was still in this state of mind and we got into an argument. I tried to leave and he grabbed me and threw me on the couch and cut my air off. I fought him off by pulling on his hair, pushing, kicking. He flew into a rage and started crashing furniture. I tried to leave again and he grabbed me again and was holding my face down in the cushions of the couch. He told me "your [sic] not leaving here under your own power." "[Y]ou'll be carried out first." I pushed him off a second time and went to the bedroom. I had only seconds to grab my gun. When I turned around he was standing just inside the doorway. I managed to get around him and tried to leave. He prevented me from doing so by coming up behind me and threw me down. We got into another physical struggle and he told me a second time he was going to kill me. When I broke free of him I fired. The first shot did'nt [sic] stop him and I fired another shot. That's the one that killed him. It was not my intention to kill him. I did'nt [sic] want any of this to happen at all. I did'nt [sic] call 911 right then because there was no time. After he was shot I paniced and did'nt [sic] know what to do so I went to my mothers [sic] where 911 was called.

On a recorded statement given to the police, the defendant can be heard giggling.

## SENTENCING HEARING

Ms. Betsy Jakalski, a probation officer for Wilson County, identified a pre-sentencing

report she compiled for the defendant's sentencing hearing. The pre-sentence report includes the victim's family impact statements and the defendant's version of the criminal offense. Ms. Jakalski testified in a records check on the defendant that she did not find any felony convictions but did find some misdemeanor arrests. On May 4, 1993, the defendant entered a plea of guilty to no driver's license, reduced from an arrest for driving on a suspended license, receiving a fine of $50.00. On May 10 and May 24, 1993, the defendant had two arrests for driving on a suspended license dismissed. On November 6, 1996, the defendant made restitution for a worthless check, which charge was nol prosed. At the time of the sentencing hearing, Ms. Jakalski testified that the defendant had two driving under the influence of intoxicants pending action of the Davidson County Grand Jury. These arrests occurred while the defendant was released on bond on April 30, 1997, and June 8, 1997, from his present conviction. Ms. Jakalski testified that the defendant advised her he was HIV positive with a suppressed immune system. Ms. Jakalski verified this diagnosis with a local medical hospital.

Brook Charlton, niece of the victim, testified regarding her feelings about her uncle, Wally Haynes. Ms. Charlton testified as to her and her brother's loving relationship with their uncle from their childhood and the devastating affect his death had on them. Ms. Charlton testified that she had no malice for the defendant and observed the sadness the defendant had caused his family. However, Ms. Charlton is very angry with the defendant, since she will no longer be able to talk and see her uncle at Christmas. Ms. Charlton advised the trial court that the defendant should pay for killing her uncle, and he should receive the maximum sentence of six (6) years.

Mrs. Vaynell Charlton, sister of the victim, testified that she believed her daughter, Brook, did a very good job in summing up the witness's feelings. Mrs. Charlton stated that she loved her brother very much and approached the trial with compassion for the defendant and his family. However, after listening to the evidence at trial, Mrs. Charlton was at a loss to explain the actions of the defendant in shooting her brother. Mrs. Charlton testified that the family did not receive any of her brother's belongings or know what happened to them. Mrs. Charlton believed that the defendant should be held accountable for what he had done.

Mrs. Jessie Haynes, mother of the victim, testified that she filed a victim impact statement, and her loss was so devastating that it could not be put into words. Mrs. Haynes expressed some doubts about how the defendant killed her son. However, Mrs. Haynes testified that she was sorry for the defendant, but that the defendant is still alive with his family. Mrs. Haynes described her son as sweet, gentle, caring, loving and

generous. Mrs. Haynes advised the trial court that the defendant should take responsibility for what he had done and not be patted on the back. As to her son's personal effects, Mrs. Haynes testified she had only received her son's stethoscope. Mrs. Haynes stated that she did not approve of her son's and the defendant's lifestyle.[1]

The defendant testified that he was deeply hurt by what he had read and seen of his offense. The defendant stated that he loved the victim and described the victim as a caring and good person. The defendant asked the victim's family to find forgiveness in their hearts so that all could move on with their lives. As to the incident, the defendant testified:

> I never planned on anything like this ever happening in my life, and if I could go back and change it, I would, but I can't. I never dreamed in my fartherest dreams that anything like it would ever happen. The things that happened that day were violent, they happened very fast, and I did what I had to do to save my own life.

The defendant testified that it had been a very hard year for him with a lot of praying and a lot of crying. The defendant advised the trial court that he had returned to church in an attempt to rebuild his life. As to the personal effects of the victim, the defendant testified that he turned over a watch, rings, and a nursing license to the Public Defender. As to his employment history, the defendant testified that he had worked at various jobs and was presently employed at Luxury Linens as a cashier. In cross-examination, the defendant testified that, on the night of the incident, he and the victim had been drinking. The defendant stated that he had been arrested twice for driving while under the influence of alcohol while on bond. The defendant stated the arrests were not for violent acts or drug-related. He also stated that his alcohol level registered very low when he was arrested for DUI. At the time of the sentencing hearing, the defendant was living with a Joseph Vincent but denied he was in a homosexual relationship with Vincent.

Mrs. Darlene Neal, mother of the defendant, testified that her son is very remorseful about what had happened. Her son cries a lot, is unable to sleep, and is not functioning very well. As a result of this incident, the defendant had some difficulties on his job. Mrs. Neal believed that her son fully complied with the conditions of probation, in that he was really trying to do better. Mrs. Neal stated that her son did not advise her of his DUI arrests.

Mr. Ben Neal, brother of the defendant, testified that he is a youth minister at a church in Marietta, Georgia. Mr. Neal and the defendant have discussed the offense several times, and the defendant has expressed remorse for this incident. Mr. Neal

---

[1]The victim and the defendant were living together in a homosexual relationship.

4

believes his brother is on a positive track and needs to enter into counseling. Mr. Neal believes this counseling is compelling for various reasons, specifically about his brother's homosexuality. He testified that he found it difficult to believe his brother would commit a violent act and advised the trial court that the defendant has a very good support system in his immediate family, uncles, aunts, grandparents, and a father who lives in Dallas, Texas. Mr. Neal believes that the defendant would comply with the conditions of probation.

Carol McDonald testified that she is a four year friend of the defendant and that he is one of the best friends she has ever had. Ms. McDonald has never seen any violence in the defendant. She believes that the defendant was acting in fear of his life when he killed the victim. She stated that the defendant called her after the incident, crying and upset, and needed to be assured that Ms. McDonald was not mad at him. Ms. McDonald assured the trial court that she would assist the defendant in complying with the conditions of probation.

Carol Bass testified that she had known the defendant since he was a teenager, while a youth coach at the College Street Church of Christ. She testified that she lost contact with the defendant until a year ago when he came back to church. The defendant would come by her home, talk about what happened, and appeared to be very sorry for what had happened. Ms. Bass does not consider the defendant a threat to the community or mankind.

Nan Smith testified that she is a customer of the Luxury Linen store where she met the defendant. Ms. Smith testified that there was something about the defendant that caused her to reach out to him, because she saw him as a broken person. The defendant advised Ms. Smith that he was living in darkness, along with people he was around, and that something horrible had happened. Ms. Smith testified that the defendant told her he killed a man and encouraged the defendant to find the forgiveness in Jesus Christ.

Frank Neal, III, testified that he is the father of the defendant and presently lives in Dallas, Texas. Mr. Neal testified that he and the defendant's mother divorced in 1983 and the defendant lived with him in Texas until 1986, when he returned to live with his mother in Lebanon, Tennessee. Mr. Neal expressed some doubts about the evidence or lack thereof that convicted his son. Mr. Neal advised the trial court that he had talked to the victim by phone on two occasions and met the victim once. Mr. Neal did not approve of his son's lifestyle. Mr. Neal testified that the defendant is not a violent person, nor did he ever intend to be, and would not be a violent person in the future. Mr. Neal sought mercy from the trial court and described his son as working, attributing to society, paying taxes, and a member of the community.

5

## SENTENCING CONSIDERATIONS

The defendant asserts that the trial court was in error for applying two enhancement factors to impose a sentence of four (4) years and six (6) months in the Department of Correction. The State disagrees and would argue that the trial court should have applied an additional enhancement factor.

When a defendant complains of the imposition of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). Therefore, the burden showing that the sentence is improper upon the appealing party. *Id.* The presumption that determinations made by the trial court are correct is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby,* 823 S.W.2d 166,169 (Tenn. 1991); *State v. Smith,* 898 S.W.2d 742, 745 (Tenn. Crim. App. 1994).

If appellate review reflects that the trial court properly considered all relevant facts and its findings of fact are adequately supported by the record, this Court must affirm the sentence "even if we would have preferred a different result." *State v. Flechter,* 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In arriving at the proper determination of an appropriate sentence, the trial court must consider: (1) the evidence, if any, received at the guilty plea and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about the sentencing; and (7) the potential for rehabilitation and treatment. Tenn. Code Ann. § 40-35-103(5); *State v. Holland,* 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

From our review of the record, we find that the trial court considered the sentencing principles and guidelines as required by the Tennessee Sentencing Reform Act of 1989. Thus, our review is with a presumption of correctness on the part of the trial court. *Ashby,* 823 S.W.2d at 169; *Smith,* 898 S.W.2d at 745.

Since the defendant was found guilty of voluntary manslaughter, the presumptive sentence of this Class C felony, Standard Offender, is three (3) to six (6) years. Tenn. Code Ann. § 40-35-112(a)(3). If enhancement factors exist but there are no mitigating factors, then the trial court may set the sentence above the minimum in that range but still within the range. Should both enhancement and mitigating factors exist, the court must start at the minimum sentence in the range and enhance the sentence within the range as

6

appropriate for the enhancement factors. The trial court shall then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e) (1990).

In determining the defendant's sentence, the trial court found two enhancement factors applicable: (1) that the defendant had a criminal behavior in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1); and (2) the personal injuries inflicted upon the victim or the amount of damage to property sustained by or taken from the victim was particularly great, Tenn. Code Ann. § 40-35-114(6). The trial court found no mitigating factors requiring a reduction of the sentence to the minimum. The defendant asserts that the trial court was incorrect in relying upon pending charges for driving under the influence for the purpose of enhancement. The record is clear, the two accusations of driving under the influence pending against the defendant had not been resolved at the time of the sentencing hearing, but these pending charges occurred after the defendant's conviction in this cause. In applying enhancement factor (1), the trial court held:

> The defendant has a previous history of criminal conduct or convictions and subsequent really, of the DUI charges, drinking and driving, this type thing since then, although he's not convicted of it, that's still behavior that you look to, doesn't have to be a conviction, but that's part of it. What you do before and after is part of it, the offense. And the offense occurred on November 3rd[,] 1996, that he was tried here for, and in April and June of '97 he was arrested twice for the drinking and driving violation. And again that just goes to the weight of what we're doing here, the fact of his conduct and the type things I might expect from him in the future based on the sentencing hearing that I have to go through.

The defendant cites that the holding of *State v. Buckmeir,* 902 S.W.2d 418, 424 (Tenn. Crim. App. 1993), as controlling. In *Buckmeir,* this Court held that the trial court improperly applied as an enhancement factor the fact that a co-defendant had pending criminal charges, which were evidence of criminal behavior under Tennessee Code Annotated § 40-35-114(1). The evidence in the record established that there was no evidence that these charges against the co-defendant were anything more than charges. The co-defendant had not been convicted of any pending charges and is presumed innocent until convicted. However, from our review of the record, the facts in this cause are distinguishable from those in *Buckmeir.* The pre-sentence report reveals that the defendant has three (3) misdemeanor arrests in 1993 for driving on a suspended license, all within a 60 day period. Two charges were dismissed, and the defendant pled guilty to no driver's license. Also, the defendant was arrested for a misdemeanor worthless check in 1996, which was nol prosed upon restitution. While on bond from a conviction of voluntary manslaughter, the defendant was arrested for two (2) DUI's occurring within 60 days of each other. Although the defendant does not have any felony convictions, he does

7

have a history of driving violations, and the defendant made a conscious decision to drink and drive, even to the point of driving under the influence of alcohol, resulting in two arrests within 60 days of each offense. We find these actions on the part of the defendant to constitute criminal behavior and that the trial court was justified in applying this enhancement factor. *See State v. Carrico,* 968 S.W.2d 280, 288 (Tenn. 1998); *State v. Burl Jarrett,* No. 02C01-9710-CC-00418, 1998 WL 518136 (Tenn. Crim. App. Aug. 21, 1998). We affirm the trial court's judgment in the application of this enhancement factor.

The defendant contends that the trial court erred in applying enhancement factor six (6) in that the personal injury inflicted upon and the property damage sustained by the victim was particularly great. The State submits that this enhancement factor can apply when the sentimental value of the property of the victim is great, although the monetary value is nominal. However, the State fails to cite any legal authority to support this issue.

In applying this enhancement factor, the trial court held:

Well, there's no doubt about personal injury inflicted, and also the amount of property involved. You know, it doesn't have to be a dollar value for someone, but little things like this stethoscope coming in a little late today, this type thing, billfold missing, jewelry missing. Something could have great value without being worth a penny[.] [I]t doesn't have to be a monetary value.

We agree with the defendant that, when ones kills another, such as in voluntary manslaughter, that great personal injury occurs to the victim. Therefore, personal injury to the victim is an element of the offense of voluntary manslaughter and may not be used, in and of itself, to enhance a sentence. Tenn. Code Ann. § 39-13-211(a). Also, the word "victim" as used in Tennessee Code Annotated § 40-35-114 is limited in scope to a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime. *State v. Raines,* 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). The family of the victim was concerned that they had not received some personal property of the victim. The defendant testified that he turned some personal items of the victim over to the Public Defender, his lawyer. It would appear that the personal property of the victim had little monetary value but great sentimental value to the mother of the victim. We agree with the language in *Raines,* 882 S.W.2d at 384, that such sentimental loss of property would result in an automatic enhancement of a sentence based on this factor. We find that the trial court was in error in applying enhancement factor (6) in the facts of this case.

The State in its brief urges this Court to apply enhancement factor (9), Tennessee Code Annotated § 40-35-114, that the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. In denying the State's request, the trial court found:

> And he did possess a firearm and, of course, he could have killed without a firearm, but I think that's included in the offense. That's the reason he doesn't have three aggravating factors, because I think that's contemplated within the law itself of the way the death occurred.

Since it is the duty of this Court to conduct a *de novo* review of the sentencing record in this cause, with a presumption of correctness, we can consider the same sentencing guidelines as required by *State v. Ashby,* 823 S.W.2d 166 (Tenn. 1991). Thus, if the record reflects that the trial court failed to find an applicable enhancement factor, this Court has jurisdiction to so find. *State v. Pearson,* 858 S.W.2d 879, 884-85 (Tenn. 1993). As in a conviction for murder second degree, the use of a firearm is not an essential element of that offense. It is the same for voluntary manslaughter. *State v. Butler,* 900 S.W.2d 305, 312-13 (Tenn. Crim. App. 1994); *State v. Raines,* 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994). We find that enhancement factor (9) is applicable to these facts.

## PROBATION

The defendant asserts that the trial court erred in denying him probation. The State contends that the record supports the trial court's judgment in denying probation.

A defendant is eligible for probation if the sentence received by the defendant is eight (8) years or less, subject to some statutory exclusions. Tenn. Code Ann. § 40-35-303(a). An especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6). A trial court must presume that a defendant sentenced to eight (8) years or less and who is not an offender for whom incarceration is a priority, is subject to alternative sentencing. *State v. Goode,* 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). However, although a defendant may be presumed to be a favorable candidate for alternative sentencing, the defendant has the burden of establishing suitability for total probation. *State v. Boggs,* 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Even though probation must be automatically considered by the trial court, "the defendant is not automatically entitled to probation as a matter of law." Tenn. Code Ann. § 40-35-303(b).

In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. *State v. Boyd,* 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995); *State v. Black,* 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).

The defendant was convicted of voluntary manslaughter, a Class C felony, and sentenced as standard offender to four (4) years, six (6) months. Accordingly, the defendant is presumed to be a favorable candidate for probation. Tenn. Code Ann. § 40-35-303(b). In denying probation, the trial court was concerned that the defendant left his mother's home and roomed with David Vincent. The defendant was HIV positive, living in a possible homosexual relationship, and spreading HIV to some innocent party. The trial court believed that this relationship could be reckless endangerment, if the defendant could give this disease to another without telling that person ahead of time, and, thus, exposing them to a possible death sentence. The trial court acknowledged it could not determine if the defendant was truthful about his association with Vincent. Further, the trial court expressed concern about the defendant's actions immediately following the death of the victim. The defendant, after shooting the victim, allowed the victim to lay there without summoning assistance. The defendant went to his mother's home in order to come up with a "good story." The trial court commented on the defendant's tape recorded statement

given to the police in which the defendant could be heard laughing throughout the statement. The trial court dismissed this as nervous laughter, which negated the remorseful testimony of the defendant at the sentencing hearing.

The defendant strongly contends that the trial court erred in denying him probation for being HIV positive and failing to disclose such disease prior to sexual activity, which violates the defendant's right to equal protection under the law. Further, the defendant contends that the defendant's criminal history does not in any way infer that his homosexuality or HIV positive status creates a risk to society. We disagree with the defendant that the defendant's HIV positive disease does not create a potential health problem for society. The General Assembly has enacted statutes covering persons infected with human immunodeficiency virus (HIV), more specifically Tennessee Code Annotated § 39-15-516, Aggravated Prostitution and Tennessee Code Annotated § 39-15-521, HIV testing of persons convicted of sexual offenses-release of test results. Although the defendant, in this cause, does not fall within the elements of these criminal statutes, his relationship, if continued, with any unsuspecting person is of public interest.

We believe that the trial court properly considered the facts surrounding the death of the victim, expressing that the defendant could have easily been found guilty of murder second degree, that rehabilitation was not likely in that the defendant had two DUI's pending, and defendant's lack of sufficient remorse made him unsuitable for probation. We agree. This issue is without merit.

The trial court's judgment is affirmed.

11

_____
L. T. LAFFERTY, SENIOR JUDGE


CONCUR:


_____
JOE G. RILEY, JUDGE


_____
DAVID G. HAYES, JUDGE